Martin, J.
then delivered the opinion of the court.*
The plaintiffs have established, that Fouque, the defendant’s vendor, was appointed their testamentary tutor by their surviving parent; that he accepted the trust, appears by the inventory, an authentic instrument, in which he takes the title of tutor. This circumstance, we consider as conclusive evidence of his acceptance of the trust. Our *483 statute expressly provides, that a succession is accepted expressly when the heir assumes the quality of such, in some authentic or private instrument, or in some proceeding. Civ. Code, 162, art. 77. A succession is accepted tacitly, when some act is done by which the intention of being heir might necessarily be supposed, id. The principle here must be the same, as ubi eadem est ratio eadem est lex. We find Fouque’s express and tacit acceptance of the tutorship, for he assumes the quality or title of tutor, by subscribing an act, in which it is given him; his assistance as tutor to the inventory, must be presumed to have had in view the giving faith and regularity to the inventory, to which the law imperatively demands the presence of the tutor. Hence the presence of Fouque is an act from which his intention to be tutor must be necessarily supposed.
East'n District.
From the date of the inventory, his property was tacitly bound. The property of the tutor is tacitly mortgaged in favour of the minor, from the day of the appointment of said tutor, for the security of his administration, and the responsibility which results from it. Id. 72, art. 75.
*484 Fouque was appointed tutor by the will of the plaintiffs’ mother. The date of that instrument is not the period at which the responsibility begins; for the will itself had no validity till the death of the testatrix. Whether on the tutor’s acceptance, this responsibility does not begin, by relation, on the day of the death of the person appointing him, is not a question necessary to be examined in this case. Being of opinion that the presence at, and subscription of the inventory, is an act which evinces the intention to accept; the acceptance must be considered by us as complete on that day. On the seventh day of December, the responsibility of Fouque began, and the tacit lien attached on his property. The defendant, who afterwards, to wit, on the 22d of June, 1811, purchased Fouque’s slaves, acquired them cum onere.
The plaintiffs have shewn, by the highest legal evidence, the record of a suit, in which they obtained judgment against Fouque, their tutor, that he is indebted to them in that capacity. They have, therefore, completely shewn, that the slaves purchased by the defendant from Fouque, are bound for the payment of their claim.
*485 ⅛ The defendant contends, that the presence t of Fouque at, and his subscription on the in-id ... . , * ventory, was not an administrative, but only i a preparatory act, which did not give rise to a tacit lien on his estate. There cannot be any doubt that the law which requires the pre-i. sence of the tutor, at the inventory, imposes s on him the obligation to see that it be faith-!⅛ fully made; and consequently, renders the tutor liable to indemnify the minor, in cáse s any loss ensues from the tutor’s negligence b or collusion. If, therefore, in the present I case, Fouque had sanctioned an inventory, in ⅛ which a part of the estate was omitted, he i incurred a responsibility, and his estate was | ipso facto bound.
The 3d sec. of the act of 1813, ch. 49, 1 Martin's Dig. 704, n. 3, expressly provides, that minors shall not lose the benefit of their tacit lien on the estate of their tutors, although there may not be any record of it.
Fouque having neglected to take the oath, and give the security which the law requires from all tutors, except those by nature, to provoke the appointment of an under-tutor, or take letters of tutorship, are circumstances which cannot alter the extent or nature of his liability.
*486 It does not appear to us that the district court erred in rejecting Fouque, when he was offered as a witness by his son-in-law. The law excludes ascendants.
The affinity of one of the married persons with relations to the other, is reputed to be in the same line and degree in which they are related to the latter. 1 Pothier, Marriage, 151.
So, the affinity of the defendant with Fouque is in the first degree of the ascending line.
The plaintiffs’ judgment against Fouque was proper evidence in the present case; the law requires the mortgagor to obtain judgment against the mortgagee, when the property is in the hands of third persons.
The judgment of the defendant against the syndics of Fouque is evidence of his claim.
It is therefore ordered, adjudged and decreed, that the judgment of the district court be annulled, avoided and reversed, and that judgment be entered in favour of the plaintiffs and appellants, for the amount of their claim, as stated in the judgment against Fouque, to wit: first, for the sum of $3584 38 cents, with legal interest thereon, from the 2d of July, 1812, till paid; — secondly, also interest upon the further sum of $1265 62 cents, from *487 the 2d of July, 1812, to the 22d of July, 1813; thirdly, also interest upon the further sum of $1050, from the 2d of July, 1812, to the 20th of May, 1814; and — fourthly, for the sum of $53, being the amount of costs in the suit against Fouque, together with costs in both courts. And it is further ordered, adjudged and decreed, that if the defendant and appellee does not pay and satisfy the amount of this judgment, within ten days from its notification, the slaves mentioned in the petition, be sold, or so much of them as will be sufficient.
Livingston, for the defendant.
Fouque is supposed to have been properly rejected, because he is the father of the plaintiffs’ wife, under the Civ. Code, 312, art. 248. The first part of this article declares, that all persons above 14 years of age, free, of a sound mind, and not rendered infamous, may be witnesses of any fact; provided, that such persons be not directly or indirectly, interested in the cause. Then follow these other provisions. The husband cannot be a witness for or against the wife, nor the wife for or against the husband. Neither can ascendants with respect to their descendants, nor descendants with respect to their ascendants.
*487 A rehearing was afterwards applied for by the defendant in the whole case; but as the part of the application which relates to the admissibility of the defendant’s father-in-law as a witness, constituted the principal and rather the only difficulty, the rest is not published.
No other objection is here made, but that the witness offered, came within the last clause of incompetency—that he was an ascendant; and of this opinion was the court: for all they say on this subject is to quote the words of Pothier. “The affinity of one of the married persons with the relations of the other, is reputed to be of the same line and degree in which they are related to the other.”
I apprehend, that the court will find that this part of the decision at least, demands reconsideration.
Our law is express: if Fouque was not the ascendant of Vignaud, he ought not to have been excluded. The court say, that he is an ascendant,because he is the father-in-law, or in other words, the father of the plaintiffs’ wife.
What is an ascendant, or its co-relative, descendant, in the sense in which they are employed by our law ? They may be defined, those who are related by consanguinity, in the direct ascending or descending line.
This definition by the term consanguinity, excludes the relations by affinity, and by the terms direct, excludes collaterals.
Let us see whether my definition is not supported by every passage in which the terms are used in our Code, or in the laws from which it was compiled.
En derecho se conceptuan tres lineas de succession; una de descendientes, que son los hijos, nictos, visnietos, y todos los que descienden y provienen unos de otros, como cadena hasta lo infinito. Otra de ascendientes y son padres, abuelos, visabuelos, y demas que retrocendiendo suben y se encuentran pasto Adam; primer progenitor y padre del linage humano. Febrero de part. lib. 2, c. 7, sec. 1, n. 2.
Muriendo algun intestado, le suceden solamente los hijos como los mas immediatos consanguinos, Id. n. 3.
Here we find, that by the Spanish law, the terms used are the same with those adopted by our Code, and that they are defined to mean what I have said, a direct ascending or descending consanguinity.
The English law uses nearly the same terms in the same sense: “lineal consanguinity is that which subsists between persons who are descended from each other in a direct line.” 2 Bl. Com. 203.
For the French law, take the author quoted by the court. La parenté que chaque personne peut avoir avec ses differens parents se divise en trois lignes; la dircete ascendante, la directe descéndante et la collaterale. La parenté de ligne directe descendante est celle que j'ai avec ceux qui descendant de moi; celle de la ligne directe ascendante, est celle que j'ai avec ceux de qui je descends. Poth. Traité des Successions, ch. 1, sec. 2, art. 3.
Now, as no man can be said to have descended from his wife’s father, and as this descent is made essential, by Pothier's definition, to the relationship in the ascending or descending line between the parties, it would seem, that this accurate writer had made a false definition in the part I quote, or laid down false law, in that quoted by the court. But some attention to the context will remove every difficulty. The passage cited by the court is taken from his treatise on marriage. The second article, in which it is contained, treats of the obstacles which arise to a legal marriage from affinity. The title of the section is—What is affinity? And this enquiry is one of a series of enquiries and definitions, which, according to this author’s usual method, he lays down, in order to determine what degree of affinity will, according to laws of France, prevent a marriage from being legal.
He defines affinity to be, the relation in which the wife stands to the relations of the husband, or the husband to those of the wife. So, that all the blood relations of the wife are affins (a word which we want in our jurisprudence) of the husband, and vice versa those of the husband are the affins of the wife. We then come to the passage in question, n. 151. The whole reads thus, “although, properly speaking, there are neither lines nor degrees in affinity, the relations by affinity (les affins) not descending from the same stock, gradus affinitatis nulli sunt. Yet in a less proper sense, we distinguish in it both lines and degrees.” Then we have the member of the article quoted by the court, “the affinity of one of the married persons, with the relations of the other, is reputed to be of the same line and degree in which they are related to the latter.” The whole of this clearly shews, that the object of the author is merely to enquire what relation of affinity will bar a marriage; but as there are properly no degrees or lines of affinity, it would be difficult to mark the degree of propinquity that would have this effect. Therefore the degrees of affinity of the wife, are measured by the degree of consanguinity, in which the person stands to the husband; and the law is then enabled to apply its prohibitions to this scale.
But, if an ascendant must have consanguinity with his descendant, of what use is it to enquire by what degrees affinity is to be marked or counted. And Pothier, even in the part relied on by the court, only speaks of the manner of affinity; but because a man stands with respect to another in the first descending degree of affinity, does it follow that he is his descendant ?
A short review of the obvious meaning of the term, whenever employed in our law, will answer the question. Civ. Code, 146. There are three classes of legal heirs, to wit: The children, and other lawful descendants; the fathers and mothers, and other lawful ascendants; and the whole collateral kindred.
“The nearest relation in the descending, ascending, or collateral line, conformable to the rules hereafter established, is called to the legal succession.”
It requires but little argument, I believe, to shew, that in these passages (and I refer to the whole title of successions) the terms, ascendant and descendant, are used to mean a direct descent by consanguinity, to the exclusion of relations by affinity. Otherwise, if the doctrine be true, that a relation by affinity, is the same as a relation by consanguinity.—If a man should die, leaving a father and mother, and the father and mother of his wife be alive, they will all inherit equally; and thus a man may leave four relations in the first degree, in the ascending line; or in other words, two fathers and two mothers. First consequence of the doctrine.
If a man die without descendants, leaving a grandfather and grandmother, the father and mother of his wife will exclude them from the succession, for the nearest in degree excludes the others, and the grandfather and grandmother can never inherit while the father and mother are alive. Second consequence.
No man, whose wife’s mother, or father is alive, can dispose of more than one-third of his property, although he have no children.—Third consequence.
A man, by marrying four or five wives in succession, secures to himself a child's portion in the estate of each of the families, because he becomes a descendant of each of his fathers-in-law. Fourth consequence.
In short, the whole law of succession would be overthrown and confounded. And I pray the court to examine every other passage in the Code, and in our laws, in which these terms, ascendant and descendant, are used; and I think they will find that there is not one in which they can give it any other meaning than a relation by consanguinity. If this be so in every other passage, why should this form an exception ? The Code declares, that words are to be understood in their most usual signification. Now, I think, without requiring any thing for my client, I may put his cause on the issue, that no one case in any book or language, or any law, can be found, in which the term ascendant, was used to signify a relation by affinity. And I am bound in defence of my client to say, that I think the court has no right to give any other sense to the words of the legislature, than that in which they have uniformly employed them, particularly when by doing it, they extend the rule for the exclusion of witnesses, who would otherwise be competent.

The rehearing was granted.

Seghers, for the plaintiffs.
This is an action in rem, brought principally against the slaves, on which we claim our tacit lien; and in a subsidiary manner, only against the defendant, their actual possessor.
It is in evidence that the wife of the defendant is the daughter of the witness, and that she had married him long before he bought those slaves from the witness.
Though the sale was executed in the husband’s name only, yet the wife is entitled to one half of them. Civil Code, 336, art. 63, 64.
The witness therefore, were he admitted, would give evidence in favour of his daughter, and eventually in his own, because, were his daughter to die without issue, he is her forced heir.
This observation would suffice to justify the decision of the district judge, in rejecting the witness. But we expect to shew that the exclusion pronounced by the Civil Code extends to the affins, as well as to the consanguinei.
By the statutes of this state, these exclusions or incapacities are threefold, viz. that of intermarrying; that of judging; and that of standing as witness; and in this they agree with the Spanish, as well as with the French and Roman laws.
Our statute provides, that marriage between persons related to each other, in the direct ascending or descending line, is prohibited; and this prohibition is not confined to legitimate children, but extends to children born out of marriage, 124, art. 9. And among collateral relations, marriage is prohibited between brother and sister, whether of the whole or of the half blood; whether legitimate or illegitimate; and also between the uncle and the niece, the aunt and the nephew Id. art. 10.
Now, the Spanish law, Partida 4, 6, 4, says, “in the degrees of the direct ascending or descending line, marriage can never be contracted, how distant soever be the degree; but in the collateral line, marriage may be contracted beyond the fourth degree.” Whether the connections are included in this prohibition, will appear by the 5th law of the title. “ When a man contracts a carnal union with a woman, whether he be married with her or not, by this union, all her relations become the connections of the man, and likewise all his relatives become the connections of the woman; and by reason of such an alliance as this, if any of those from whose union it sprung, should die, the following obstacle would arise—that the surviving person could not marry with any of the relatives of the deceased, within the fourth degree inclusive, in the same manner as in kindred.” And Gregorio Lopez, on this law observes, that “the obstacle would be perpetual between the connections in the ascending and descending line.”
The provisions of our Code are the same as those of the Partida just quoted, except, that the prohibition has not the same extension in degrees; and as the fifth law contains nothing contrary to, or irreconcilable with, the said provisions, we maintain, that they are to be explained by this law, which is still the law of the land.
The doctrine laid down in this law, is likewise held by Rodriguez, in his Digesto teorieo-practico, 38, 11. “Affinity is a species of kindred established by the civil law, between the husband and the relatives of his wife, and between the latter and the relatives of her husband. And the degrees of affinity in which wife stands to her husband’s relatives, are the same as the degrees of consanguinity in which he stands to them, and vice versa. So, that the husband stands in the second degree of affinity to the sister of his wife. But it most be understood, that the husband and wife contract no affinity between themselves; consequently, there is no affinity between their respective relatives. The affinity arising from marriage, extends to the fourth degree inclusive.” In the same title we had the Roman law on which this doctrine is founded. Dig. 38, 11, 4 (which, in the Corpus Juris Civilis, is 38, 10, 4.)
No. 4. The names of the connections are, father-in-law, mother-in-law, son-in-law, daughter-in-law, step-father, step-mother, step-son, step-daughter. No. 7. Between these marriage is prohibited, because by reason of their affinity, they stand to each other in the respective situation of parents and children.
These principles are those of the most eminent writers on the Spanish, French, and Roman laws, as will be sufficiently apparent from the following quotations:—
The relatives of the husband are connected with the wife in the same decree in which they are related to the husband, and vice versa. In the ascending and descending line of affinity, marriage is prohibited by the law nature, between the father-in-law and the daughter-in-law, the son-in-law, and the mother-in-law; between the step-father and the step-daughter, the step-mother and the step-son. For as the husband and wife are but one flesh, the daughter-in-law does in no wise differ from the daughter. And as marriage between father and daughter is null by the law of nature, the same must be said of that between the father-in-law and the daughter-in-law; the reason is, the natural respect due to those ascendants, because they are to each other as parent, and children. Affinity in the direct line, is a perpetual obstacle to marriage, as in the case of consanguinity: in the collateral line it does not extend beyond the fourth decree.
Matienzo, in lib. 5, Recopil. p. 21, n. 174, 175. Marriage is forbidden in the first four degrees of affinity. The affinity of which we speak is this; the husband and wife being, by their marriage, but one flesh, all the relatives to the husband become connected with the wife, in same degree in which they are related to the husband, and vice versa; but the relatives of the husband are in no degree connected with those of the wife. It must also be observed, that the affinity continues to exist even after the death of him from whom it sprung. 2 Martin, 75, n. 123, 126, 127. Affinity, which is a connection of persons proceeding from a carnal union, is an obstacle to marriage between the persons connected, as far as the fourth degree; if the marriage is contracted, it annuls it. Pothier, Contrat de Mariage, n. 160.
Since that time (the eighth century) marriages between connections have ever been prohibited in the same degrees as those between relatives; and when permitted between the latter, this permission extended to connections within the same degrees. Vinius’s Institutes, lib. 1, tit. 10, n. 6.
We must abstain from certain marriages through regard to affinity, as with a wife's daughter, or a son’s wife, for they are both in the place of daughters; and this rule must be so understood as to include those who have been our daughters-in-law.
Vinius's note on this text. The rule of the civil law is, that no marriage can take place between those who are in the number of parents or children, which is also the case in affinity. Febrero ad. 1, n. 169. Marriage between near relatives and connections is prohibited as incestuous. The rule for affinity is this—marriage is prohibited on account of affinity, within the same degrees in which it is prohibited on account of consanguinity.
It results from these authorities, that the prohibition pronounced on this head by our statute, includes the connections as well as the relatives; for as we have already stated, the Spanish law, on this subject, contains nothing contrary to, or irreconcilable with this statute, and is therefore still, in force. Besides, the concordance of all those authorities shews that they spring from a common source; and as our statute derives likewise from this source, it is to it we must look for the explanation of any difficulty or doubt that may arise in its application. Heineccius on the Inst. n. 152, 160.
The same principle of affinity applies to the incapacity of judging. On this subject we will confine ourselves to the Spanish laws and the Spanish writers.
Whenever the judge, before whom a cause shall be pending, is in any manner related to either of the parties, it shall be lawful for either of the parties interested in the cause, to challenge the said judge. 2 Martin's Dig. 194, n. 11.
The Spanish law, on this subject, is as follows:—
We order, that he who challenges any judge, by reason of kindred or affinity, be obliged to state, in particular, the degree of such kindred or affinity, and the medium or cause whence it comes; and that if he makes no such statement, the challenge be not admitted. Nuev. Rec. 2, 10, 19, n. 4.
The petition for challenging the judge must express the legal cause of it, and if he be challenged by reason of consanguinity or affinity, it must be stated whence it comes, and in what degree. Cur. Phil. 1, sec. 7, n. 18.
It will certainly not be pretended, that these laws are repealed by the statute; and we would ask, if any judge could be found so void of delicacy as to disregard them, and sit on the bench in a cause in which his father-in-law or brother-in-law were a party.
We will dismiss the subject with the two following quotations:—
If the judge is the relative or connection of one of the parties, it is a just cause for challenging him. 1 Murillo, 1, 2, 286. There are many causes for challenging the judge as suspected of partiality; the first, for having a great intimacy with one of the parties; the second, for being related to or connected with one of them, but not, if he is so with both. Feb. ad. 2, 3, 1, n. 431.
Coming now to the exclusion or incapacity of standing as a witness, we find on that head, the following disposition in our Civil Code, 312, art. 248. The competent witness of any covenant or fact, whatever it may be in civil matters, is that who is above the age of fourteen years complete, of a sound mind, free or enfranchised, and not one of those whom the law deems infamous. He must, besides, be not interested, either directly or indirectly in the cause. The husband cannot be a witness either for or against his wife; nor the wife for or against her husband; neither can ascendents with respect to their descendants, nor the descendants with respect to their ascendants.
This latter part agrees with the Spanish law.
Partida, 3, 16, 14. The father, grandfather, and other ascendants in the direct line, cannot be witnesses for their sons, grand-sons, and other descendants in the same line; neither can any of these descendants be witnesses for those from whom they descend.
We say, that these laws agree in the exclusion of the ascendants and descendants, as witnesses in favour of each other. As to their exclusion as witnesses against each other, we have, in the same Partida, and title the law 11th, which runs as follows:—
All the ascendants and descendants in the direct line, and in the collateral line, relatives, within the fourth degree, cannot be compelled to be witnesses against each other, in suits touching their person, their fame, or the greater part of their fortune. Neither can the son-in-law be compelled to give evidence against his father-in-law, nor the latter against his son-in-law; neither the step-son against his step-father, nor the latter against the former. The reason is, because they must consider each other as father and son. But their voluntary testimony against one another, may be received, and must be looked upon as valid.
And on the subject at large we have the following law:—
Regularly, all persons may be witnesses, except those who are prohibited, among whom are the following:—the relative within fourth degree; the one who has an interest, in the cause; the one the cause; the intimate friend; and capital enemy. Cur. Phil. 1, sec. 17, n. 13.
The note on this article refers to Barbosa, vot. decisiv. vot. 9, n. 6, where we find the following illustration:—
Those who are related to, or connected with one of the parties in the fourth degree, prove nothing, and deserve no credit. If the witnesses produced by one of the parties, should reap any advantage from their own testimony, because the property in question might thereby become theirs, or their descendants might have it by succession; in that case, it is certain, that they are not proper witnesses. The reason is this; if witnesses do not prove in a case wherein some of their affections are concerned, or some praise or blame might accrue to them, though the suit be not principally against them; much less must those prove who depose in a case whence they might reap a benefit, though only consequential; because they are supposed to be blinded, by it.
If this authority could leave some doubt in the explanation of the law on this matter, it would be removed by the uniform doctrine of Murillo and Febrero, which agrees with that of Barbosa, as will be seen from the following extracts:—
There are certain persons who cannot be witnesses for each other, thus male and female ascendants in the paternal and maternal line, cannot be witnesses for their descendants in either line, nor the step-father for his step-son, neither can descendants testify, in favor of their ascendants; for all these are held as suspicious on account of their natural affection for one another. For the same suspicion of affection, the husband and wife are not admitted as witnesses for each other. Relatives and connections within the fourth degree exclusive, are rejected as witnesses for their relatives and connections in criminal causes, and in civil suits of importance, because affection for one’s relations and friends is commonly an obstacle to truth. Art. 154, n. 6, 289. Parents cannot be witnesses against their children, even if they consent to it; nor can the latter be witnesses against the former; neither can relatives within the fourth degree, depose against each other, nor the father-in-law against the son-in-law, the wife against her husband, the step-father against the stepson, and vice versa. Yet in Spain, though ascendants are not compelled to give evidence against their descendants, they are admitted to depose against them of their own free will. 1 Murillo, 287, art. 153.
There are various persons who are not compellable to he witnesses against one another:—such are ascendants with respect to their descendants, and vice versa, whether in a criminal or civil cause; this is founded on the love of parents for their children, and on the respect due by these to their parents. Under this head are classed the father-in-law and mother-in-law, the son-in-law and daughter-in-law, the step-father and step-son, who, though willing, are not admitted as witnesses by our common law. Neither are relatives and connections, within the fourth degree, obliged to be witnesses, because it were hard to compel them to testify against their own blood. All these however, if they consent of their own accord to be witnesses against the above named persons, are admitted by the Spanish law. Id. 301, art. 78.
Ascendants and descendants are not admitted as witnesses. Ascendants and descendants, as well as collaterals, within the fourth degree, cannot be forced to appear as witnesses against each other, in causes touching their persons, fame, or the greater part of their fortune; neither are the father-in-law, son-in-law, step-father, and step-son, compelled to give evidence against each other, tho‘ this evidence is admitted if freely given. Febrero, ad. 2, 3, 1, n. 297 & 300.
These principles are those of the French jurisconsults, as may be collected from the following quotation of Evans’ Pothier, vol, 1, 518, n. 792: we reject the depositions of witnesses, who are related to, or connected with both or either of the parties, as far as the fourth degree of collaterals inclusive. Observe, that relatives and connections of a party, cannot depose in his favour, or even against him. Kindred and alliance induce a suspicion of either amity or hatred, either of which is repugnant to impartiality.
Turning to the Roman law, its doctrine will be found to corroborate the positions we hare taken. La Clef des lois Romaines, tom. 2-632, verbo Temoin.
The law Julia, on public judgments, forbids compelling any one to give evidence against his father-in-law, his son-in-law, his stepfather, or step-mother, his cousin, or second cousin, and those who are related to him in a nearer degree. Dig. lib. 22, tit. 5, l. 4.
There are some persons whose testimony is not received but in certain cases; among these are parents against their children, and reciprocally. Dig. lib. 22, tit. 5, l. 9. Code, lib. 4, tit. 20, l. 5.
Those who are not bound to give evidence against one of the parties, are relatives within the seventh degree, and connections who stand in the respective situation of ascendants and descendants. Dig. lib. 22, tit. 5, ll. 4 & 5, lib. 38, tit. 10, l. 10.
It is undeniable, that the Spanish legislator, and the compiler of our Code, in using the terms of ascendants and descendants, meant thereby the connections as well as the relatives. The former by his 11th law, had prevented the possibility of a doubt on the subject; the latter derived his disposition from the former, and both from the common source, the Roman law; the true meaning of which is sufficiently expounded by the unanimous opinions of all civilians. Neither can the assertion hold, that the Spanish law, on this subject, is repealed by our statute; for so much of those exclusions as it intended to repeal, has been expressly stated in our Civ. Code, 312, art. 249, where it is said, the circumstance of the witness being a relation in the collateral line, as far as the fourth degree inclusively, of one of the parties interested in the cause, or engaged in the actual service or salary of one of the said parties, or a free coloured person, is not a sufficient cause to consider the witness as incompetent, but may, according to circumstances, diminish the extent of his credibility. What then would be the use of this article in the Code, if it is not to repeal that part of the exclusions pronounced by the Spanish law ?
From all this we conclude, and expect to have satisfactorily shewn, that the expressions used in our Civ. Code, loco citato, of ascendants and descendants, include the affins or connections, as well as the consanguinei, or relatives.
It is contended, that they are not included, because, if this doctrine should prevail, the connections must he admitted to the right of succeeding to the estates of each other, on the same footing as the relatives.
The doctrine we maintain, remains unimpaired by this observation, for the consequence thereby drawn from the above principle, is precluded by a positive law, as we are taught by Febrero, in his edition Addicionado, part. 1, cap. 1, n. 169: where he says—affinity gives no right to succeed to the estates connections; referring by the note to the Justinion Code, 6, 59, v. 7, where we meet with the following provision; affinity gives no right to successions.
Before concluding this argument, we must moreover observe, that the witness, independantly of the actual interest of his daughter, and his own eventual one, as already stated, has himself a direct and actual interest in the cause, as vendor of the very negroes against whom this action is chiefly brought, as liable to our tacit mortgage. We ground this position on the Spanish law, Partida, 3, 16, 19. If a person has purchased a thing from another, and a suit is afterwards instituted against him for that very thing, he cannot produce as his witness, the person front whom he purchased it, because the latter being bound to make it good, is as much concerned in the suit as the purchaser himself.
The counsel for the defendant maintains, that even on this head, the witness is uninterested in the event of the suit; for, says he, the plaintiffs are his creditors for the amount of their claim, and they will remain his creditors if there be judgment against them; if, on the contrary, judgment be given in their favor, then the defendant becomes of course his creditor for the same amount, and consequently the witness will only have exchanged one creditor for another, without altering the debt.
This may be true to a certain degree, but the witness is not the less directly interested in the event of the suit; for if there be judgment in favor of the defendant, both credit and debt stand unaltered, the,plaintiffs having then no right to charge the witness with the costs of this suit; while on the contrary, if judgment be rendered for the plaintiffs, they recover those costs from the defendant, who thereby becomes the creditor of the witness, not only for the amount of their claim, but moreover, for the amount of those very costs, which therefore at least constitute the direct interest of the witness, in the issue of the cause.
Livingston, for the defendant.
Exclusions contained in our Code, 312, art. 248, which is our only rule on this subject, relate only to persons standing in the enumerated relations to the parties to the suit, not to those who may have those relations to others remotely interested in the event. For instance, a witness sworn on his voir dire, declares that he is the plaintiff’s security for costs, or that the plaintiff has promised him a certain sum if he recover; either of these facts will exclude his testimony; but was it ever supposed that the father or son of a person standing in the predicament of such witness, would also be excluded ? I should think not. The witness would in such case be indirectly interested; that is to say, if the plaintiff was unable to pay the costs, he would be obliged to pay them, which is an indirect interest for loss: and if the plaintiff gained his cause, and if he complied with his promise, he would recover the stipulated sum, which would be an indirect interest for gain; but the Code does not exclude the ascendants and descendants of those who have an indirect interest, but the ascendants or descendants of those who are parties ; and by a liberal construction, those who have a direct interest ; that is, those who (not those who may) gain or lose by the decision of the cause. The words are, “ the husband cannot be a witness for or against his wife, nor the wife for or against her husband. Neither can ascendants with respect to (that is to say, in reference to the prior member of the sentence, for or against) their descendants, &c.
Now, here the wife, if she have any interest, has only an indirect and eventual one.
It is doubtful whether she is in community with her husband. It is true, the Code declares that every marriage contracted within this territory, carries with it a community: but how does it appear that those parties were married here. They may be, and probably are, from some other part of the world. Whatever is necessary to support our objection, must be shewn by the party making it. If this fact is necessary, then the plaintiff should have put the evidence of it on the record.
But even if the community did exist, it creates no direct interest in the wife; by the 66 art. p. 336, of the Code, the husband is head and master of the community ; he may sell and even give it away without the consent of the wife. &c. Now, it appears to me rather paradoxical, to say that I have a direct interest in any thing which another may sell or throw into the fire, without my consent. I may have a direct interest in a thing of which another has the administration; but not in that which he may destroy or give away; these are acts of absolute, undoubted ownership, which preclude the idea of direct interest in any other.
The truth is, that the wife has no interest whatever in the effects which compose the community, while the community lasts; but she has a right to one half of the gains, which, at the dissolution of the community, appear to have been made while it lasted; then her interest becomes vested and direct; until then, it is wholly eventual and uncertain; depending on the will or caprice, or mismanagement of the husband. The words of the law render this clear. She is entitled to the community of acquets or gains, art. 63. But this can only be known at the dissolution of the community. In common partnership, the stock and the profits belong as much to one partner as to the other, even if there be no gains; but in the matrimonial partnership, the wife is only entitled to one half of the gains; and therefore, whatever acquisitions have been made, if there is not a balance of gains, she has nothing.
In this case, although Vignaud should be decreed to be the owner of the slaves, it may not increase the community; because he may owe more than their value: and even if he do not, it depends on the event, of his future administration, or on his will alone, should he incline to give them away, whether they will increase the amount of the common property at the time of his death. The wife then has only a contingent interest; and that of her father, depending on the existence of profits for his chance to acquire, on her dying before him, and on her dying without children, is still more remote; he is not an interested witness.
Whether he is excluded under the terms of our Code, is the main enquiry.
I have laid it down, that all persons not coming under the exclusions in the 248th art. of the Code, are competent. For the article begins with declaring, who shall be a competent witness— if above fourteen, free, of sound mind, unimpaired by connection of an infamous crime, and uninterested, the witness is competent. The only further exclusions are those of persons standing in the relation of husband or wife; or ascendant and descendant. Can it be doubted, that these are the only qualifications and exceptions? If they are not, then intimate friends, inveterate enemies, and the other persons incapacitated by the civil law, would all be excluded. But even if this article of the Code should not be deemed to repeal the former laws on this subject, there is a statute which certainly does: The act of 1805, establishing the practice of the superior court, expressly declares, that direct interest or infamy only shall render a witness incompetent. This law is unrepealed, except so far as the Code has encreased the number of exceptions. The only question then is, whether the wife’s father is the ascendant of the husband; I have shewn the uniform, the invariable sense in which this term is used in the same Code, in which this provision is contained. And I ask them, whether they ought to give it a different interpretation from that which the legislature, unbroken by one single exception, have given.
I cannot but think the reasoning of the plaintiffs, on this point, somewhat curious. We are enquiring whether the wife's father is the ascendant of the husband; this is our only enquiry.
And to answer it, we are gravely told, that a man cannot marry his wife's grandmother; and that a judge cannot sit in judgment on the wife of his son. For the learned pages of the plaintiffs brief really tell us nothing more. Now, all this I am perfectly ready to acknowlege; and moreover, to agree, that this is in perfect concordance with the Roman, Spanish, and French laws.
But, does it follow from this, that the ascendant of the wife is also the ascendant of the husband; which is our only enquiry ? If the authorities, indeed, had shewn, that the words in a statute had been construed by any commentator, in the way he contends : for, I confess this would have some remote application. Because, even then, our courts must adopt the sense in which our own lawgivers have used the word, rather than that in which commentators have given to it.
The example taken from Part. 4, tit. 6, law 4, is a striking proof, that when this construction is to be given by law, the law takes care to express it. Here, marriage in the ascending and descending line, is forbidden : according to the plaintiffs reasoning, this would have been sufficient to exclude relations by marriage or affinity; but the Spanish lawgiver did not think so, for the subsequent law (5th) expressly extends it to the connections by marriage. This law being unrepealed, I agree with the defendant’s counsel, that it prevents marriages within the degrees of affinity prohibited, but I really cannot see how this applies to witnesses.
The authority from Rodriguez's Dig. ley. 38, is explanatory of the degrees of affinity, which I never intended to dispute ; and if our law on the subject of witnesses, had spoken of the degrees of affinity, there would have been an end of the dispute.
Murillo is to the same effect, still speaking of the prohibited degrees of affinity or consanguinity in relation to marriage. Which rules were founded on very different reasons from those which render witnesses incompetent. The same observations apply to Matanzo, Febrero, Pothier, and Heineccius.
The authorities on the subject of challenges to a judge, seem doubly unfortunate. For they are not only inapplicable to the case of witnesses, but shew most explicitly, that whenever the a capacity is intended to be created by affinity as well as consanguinity, they take great care, as in the case of marriages, to express it.
Martin's Dig. p. 194, n. 11, the expressions are in " any manner related,” which clearly includes a relation by affinity.
The Recopilation expressly uses the term “ affinity,” as well as kindred.
The Curia Phillippica uses the same words.
These laws, it is said, are not repealed. It is perfectly indifferent to my argument whether they are or not; if in force, they govern only the cases for which they were made; but whether in force or not, they serve ray argument, by shewing, that the Spanish legislators thought affinity and consanguinity two different relations, and when they wished to include the former, they used express words for that purpose.
We come now to the authorities on the subject of witnesses; and here the plaintiff is, if possible, still more unfortunate in his quotations.
The Spaniards, it seems, had a law nearly in the terms of ours, 3 Part. 16. 14, declaring, that ascendants and descendants could not be witnesses at all. But the 11th law, also quoted by plaintiffs, after specifying, particularly, the ascendants and descendants, eo nomine, enumerates other relations, and among them, particularly sons-in-law, and fathers-in-law ; declaring that they cannot be forced to give testimony for each other; but their voluntary testimony against each other, shall be received. Does not, this clearly prove that the Spanish law considered the relations as different, by making different provisions with regard to them. All the commentators follow the text on this subject, as might be supposed ; and all particularly enumerate the relations by affinity, as being excluded by this express law, which, as we have seen, provides for their exclusion by name.
The truth then is, that relationship, by affinity, prevents marriage when within the prohibited degrees.
That it is a good cause for challenge to a judge.
And that, under the law, as it stood before our statute, it was a good objection to a witness.
But, that since our repealing statute of 1805, no other objections are good, but those created by that statute or the Civil Code, and that no other relations, but direct ascendants or descendants, being contained within those exceptions, no other relationship will disqualify.
The objection of interest, with which the plaintiffs close, I have before answered.
1. By shewing there is no interest.
2. By saying, that this objection was not made at the trial, and that if it had, and the court had sustained it, it might have been removed by a release.
Seghers, for the plaintiffs.
The Code provides an action for the wife against the heirs of her husband, for one half of the common estate, which he might have disposed of to her injury. Does not this clearly shew that she has a direct interest in the common property, though the husband has the administration and even the disposition of it ? For otherwise, whence would her action originate ?
The reasoning by which the defendant’s counsel endeavours to establish the contrary doctrine, is grounded on the first part of the art. 66, p. 336, already quoted, which says, that the husband is the head and master of the community; that he may dispose of the effects thereto belonging, without the consent of the wife; because she has no sort of right, in them, until the community be dissolved ; but here he has overlooked the latter part of the same article, as we have already observed. There is an instance in which the wife may likewise dispose of the effects of the community without the consent of her husband. Civ. Code, 28, art. 25.
“The community may be considered as a moral being. The stock of the community belongs to both the husband and wife. But the community cannot act by itself; some one must administer its effects; some one must represent it; this will devolve on the husband. Through his agency the community will do whatever it would do by itself were it a real being: all its powers are thus transferred to its administrator. Yet he cannot injure his wife; he can do nothing to defraud her of the rights which she has in the community. The husband is in short an administrator, who has the same power as the owner; that is, the community, to which he is accountable for the use he makes of it.” Leclercq 5, Droit Romain, 9,
“ The wife cannot alone and by herself, dispose of any thing of her share in the community while it lasts : but she may do it jointly with her husband. When the husband contracts and disposes alone of the effects of the community, as he is supposed to contract in his capacity, as head of the community, he is supposed to contract both for himself and for his wife ; and his wife, though neither present at, nor named in the contract, is supposed to contract with him for the share which she has in the community,” Pothier, Traité de la communauté, n. 498.
“When the wife is a public merchant, and disposes of the effects of the community, she is deemed to dispose jointly with her husband, who is considered as approving such contracts.” Idem. n. 500.
To the defendant’s counsel, it was reserved to inform us, that the wife has no direct interest in her husband's increasing or impairing the common stock; or in other words, in his growing rich or poor. Could it even be for a moment admitted, according to his doctrine, that the wife has only a contingent interest in the common stock, it were no less true that she has an actual and direct interest in the increase of that stock, even if it were only with respect to the income. For her daily comforts, and her family’s, must keep a proportion with the common revenues which constitute the means of her husband. Civil Code, 26, art. 20.
The wife then, has not a contingent, but a direct interest; and that of her father, on her dying before him without issue, is not so remote as not to create an indirect interest; he is therefore an interested witness.
It is contended that the civil law was repealed by the act of 1805, establishing the practise of the superior court. It seems indeed, that the common law was thereby introduced on this subject, in the stead of the civil law. But in conformity with our general system of jurisprudence, the latter was restored by our Civil Code, confining however the further exclusions to the ascendants and descendants. We do not certainly incline to extend the exceptions any further, but we maintain that the civil law having thus far been restored, the words which it uses must be explained according to its rules, which are far from being impaired by the meaning given to the same terms in other parts of the Code.
The defendant's counsel contends, that if the affins or connections, are under legal incapacities, it is not because the law considers them in the same light as the consanguinei, or relatives, but because they are, eo nomine, designated in the law. His reasonings present us with a striking instance of his error on the point.
The statute of 1805, which he is pleased to call the repealing statute, is itself repealed in toto by the Code since, by the two articles 248, and 249, all its dispositions are literally either preserved, altered or repealed; and as we have stated in our former argument to which we must refer the court, those two articles of our Code, clearly shew by themselves what incapacities pronounced by the civil law, were thereby intended to be preserved or abrogated.
Marriage between persons related to each other in the direct ascending or descending line, is prohibited. Civil Code, 24, art. 9.
The husband cannot be a witness for or against his wife ; neither can ascendants with respect to their descendants, or the descendants with respect to their ascendants, Id. 312, art. 248.
Where is the difference between these two provisions, either in their words or in their meaning, to justify the two opposite inferences which the defendant strives to draw from them, that the first includes relatives by affinity, and that the latter does not ? Did there exist any, would it not be in favor of the first, which contains the word direct, not to be found in the latter, though the defendant liberally bestows it on this too ? It is true, that our legislators have been somewhat more explicit on the incapacity of judging, than on the others; but does it follow that the uniform rule is thereby repealed as to the latter.
By an attentive perusal of the laws quoted, it will be found that their different provisions proceed, not from any distinction between relatives and connections, but from a difference in the cases to which they apply ; it will be found moreover, that the 11th law, in enumerating the connections after the relatives, gives the reason why they are considered in the same light. And it is to be observed, that afterwards, the 14th law, speaks only of ascendants and descendants, as does our Code, without making any mention of affinity or consanguinity. Yet all the commentators in analyzing this law, do not hesitate to say, do not even make it a question, whether the connections are therein included, as well as the relatives.
" It was necessary in order to perfect the union of marriage, that the husband should take the wife’s relations in the same degree, to he the same as his own. without distinction, and so vice versa ; for if they are to be the same person as was intended by the law of God, they can have no difference in relations ; and by consequence, the prohibition touching affinity must be carried as far as the prohibition touching consanguinity.” 4 Bacon's Abridgment, 527.
" Hence it hath been adjudged that the marriage of two sisters, one after the other, was incestuous, being in the second degree.” Ibid. 528.
" So it hath been resolved, that marrying the sister's daughter is incestuous, being in the third degree. So it hath been resolved in a variety of books and cases, that the marriage with the wife’s sister's daughter was incestuous, being likewise in the third degree, and the degree of affinity being the same with that of consanguinity.” Ibid. 529.
The reasons on which the rules of prohibition, in relation to marriage, are grounded, are certainly different from those which render witnesses incompetent; but both derive from a common source the intimacy which exists between relations within the prohibited degrees. For, if on one side the familiar intercourse, resulting from this intimacy, would endanger morals; on the other side, this same intimacy must produce such an affection as to blind the witness, and endanger the truth and impartiality of his deposition.
The objection which rested on the costs of this suit, stands unimpaired. It might have been removed, says the defendant, by a release at the trial. The counsel here forgets, that at the trial, the defendant had as yet no claim on the witness for those costs, as they were neither decreed by the court, nor paid by him; and that consequently he could give no release. " A release is the giving or discharging of a right of action which a man hath, or may claim against another, or that which is his.” "It is a general rule in our books, that a mere possibility cannot be released, and the reason thereof is, that a release supposeth a right in being.” Jacob's Law Dictionary, verbo Release, 1 & 5.
Some doubts have arisen on the correctness of an assertion contained in the Latin index of the Partidas, verbo Affinitas, in fine: Affinitatis tres sunt gradus, ascendentes, descendentes et collaterales, n. 1, per text. Ibid. leg. 2, tit. 13. Partida, 6.
On referring to the indication, we find that this law 2, treats of the degrees of consanguinity only. But it must be recollected, that the Latin index relates to the notes, not to the text. The note on this law refers to Partida. 4, tit. 6, l. 2. Que cosa es linea, por do desciende ó sube el parentesco : é quantas lineas son. This law cannot be detached from the law 3, which is but a continuation of it, as appears from the title : que cosa es el grado, porque se cuenta el parentesco: e quantas maneras son del. The commentator in his Latin text, explains the law as follows: Secundùm jus civile alitér considerantur gradus, et aliter secundum jus canonicum. Sed in ascendentibus et descendentibus utrumque jus concordat. Et secundùm primam computationem, gradus dicitur connumeratio singularum personarum, cognatione vel affinitate sibi conjunctarum. Secundum aliam, dicitur gradus enumeratio personarum, cognatione vel affinilate conjunctarum.
The law 4, gives the manner of counting the degrees of consanguinity; and the law 5, says, Por tal allegança como esto todos tos parientes de la muger se fazen cuñados del varon, e otrosi los parientes del se fazen cuñados de la muger ; cada uno dellos en aquel grado en que son parientes. And the commentator in the Latin text, says, Copula carnalis per matrimonium facit virum affinem consanguineis fœminœ, in eo gradu in quo tangunt eam per consanguinitatem, et idem, et è contra.
It must be remarked, that the Latin index of the Partidas, may in some manner be itself considered as an authority. It was composed by the nephew of the commentator. The edition from which the quotation of the index, and the foregoing abstracts are taken, is of 1767 ; the text, gloss and citations of which, were reviewed and corrected, with the greatest care, by the order of the royal council of Spain. Therefore, I am convinced that the passage quoted, far from being an error, either of the author of the index, or of the editor, is an assertion warranted by the several parts of the text and gloss which I have cited.
I am still more strengthened in this opinion, by the uniform doctrine of the elementary writers on the subject.
Elizondo, Practica Universal, tom. 1, 358, n. 10. Entre los affins en la linea recta de ascendientes y descendientes, es prohibido el matrimonia por derecho natural; y en la colateral, por derecho positivo ecclesiastico tan solamente.
Murillo, lib. 4, n. 128, p. 78. Nunc arborem consanguinitatis et afinitatis ob oculos apponere decreví, ut sic facilius lineœ et gradus percipiantur. Then p. 79, he gives the arbor consanguinitatis, in which the first four degrees in the ascending, descending and collateral lines are respectively established ; p. 80, we find the explanation thereof, Nomina consanguineorum sunt sequentia : in lineâ rectâ ascendente sunt in primo gradu, & 5. He then goes on citing them eo nomine, as well as the descendants and collaterals; p. 81. we meet with the arbor affinitatis, in which the first four degrees of affinity in each of the ascending, descending and collateral lines, are, likewise laid down. Then p. 82. n. 129, we find this explanation. Affines in primo gradu sunt sequentes : in lineâ rectâ ascendente, socer: uxoris vel marili pater : suegro — socrus : uxoris rel marili mater : suegra-vitricus : vir matris : padrastro — noverca : uxor patris : madrastra. in linea recta descendente, gener : maritus filia, yerno — nurus: uxor filu,:, nuera — privignus: filius ex alio conjuge : hijastro — privigna : filia ex alio conjuge: hijastra, in linea obliqua sunt, See.
Heineccii Recitationes, tom. 1, lib. 1, tit. 10, n. 156. De adfinitate observandum, ejus proprie nullos esse gradus, quia adfinitates non nascuntur ex generatione, sed ex nuptiis. Sed analogicè tamen et in affinitate œquè gradus statuuntur, et eodem modo numerantur, ac in consanguinitate. Sie et schemata eodem modo pinguntur ac in consanguinitate.
Livingston, for the defendant.
My doubt whether the wife, in this instance, has any interest whatever in the community, inasmuch as it is not shewn where the marriage was contracted, it is supposed ought to vanish before the authority quoted from 4 Martin, 649; that property acquired here after marriage in a foreign country, is governed by our laws; this may be true, when there is no contract, containing covenants to the contrary ; here nothing appears on that subject, and I have shewn that the burthen of making out the whole case, for the exclusion of a witness, is shewn on the party objecting.
Next it is said that I could not have argued that the wife’s interest in the community is eventual, if I had read the latter part of the article of the Code, 336 (66) which I have quoted ; that part declares that the wife may sue the husband’s heirs for one half of the acquired estate, which the husband may have fraudulently disposed of, to her injury; I certainly was careless in not drawing the attention of the court to this clause, because it strongly supports my argument, which went to shew that the interest of the wife which was eventual during the life of the husband, vested only on his death; and that then, and not before, an action was given to the wife, to recover what he had fraudulently disposed of; or in other words, had not disposed of at all; for a fraudulent act is null.
If the wife had a vested or direct interest during the life of the husband, surely some means would be pointed out of preserving it during the community, but there is none but by putting an end to it.
The other argument drawn from the Code, 28, art. 25, is surely no objection to my argument; for the carrying on the separate trade, which is the subject of that article, depends wholly on the will of the husband, and gives her no other control over that part of the community, than he allows.
The quotations from Leclercq and Pothier, contain nothing that I contest. The husband certainly administers the community for the eventual benefit of the wife; but none of them say the interest is a direct and present one; if the husband is unfortunate or imprudent, the wife will have no gains; and whatever depends on a contingency, is not present and direct. I do not repeat my former arguments on this point, but pray the court to refer to them; and confidently hope they have shewn that Fouque is not an interested witness.
That he is expressly excluded, the counsel, in addition to his former argument, thinks is clear, because he thinks the Civil Law, on the subject of witnesses was restored by the adoption of our Civil Code. The court will hesitate long, I believe, before they adopt this strange construction; which I would willingly combat, if I could discover any argument by which it is supported.
When I assert that none of the Spanish commentators shew that the word ascendant or descendant in a statute, has been construed to mean a relation by affinity; I have repeatedly re-perused the authority to which I have been referred, and must seriously declare that I can find nothing in it contradicting my position ; perhaps the court may he more fortunate on referring to it; all it says on the subject, is enumerating persons disqualified as witnesses, el pariente hasta el quarto grado. Now as I have shewn that there were express statutes, excluding the affins, as well as the consanguinei, and this is a practical book, which gives the summary of the rules on the subject from whatever source derived ; I confess I cannot see how he contradicts my assertion; as to Barbosa, not having the book I cannot refer to it; but if he gives that interpretation of the word, the passage ought to have been quoted.
But whether the exclusion of affins in the Spanish law arose from statute, or was derived from the general principles of the civil law ; whether we have it in the statute book, or in the elementary writers; it was still a positive law, bearing upon that direct point, and. expressly declaring that affins cannot be witnesses; but this law is no longer ours, it is repealed, and express terms are introduced which our court must construe in the sense in which they are used in the same Code; and moreover, they must be uniform in that construction; and if they say that ascendants means affins in the exclusion of witnesses, they must give it the same construction where it is elsewhere used in the same Code of laws. The consequences of this, as respects successions, I have pointed out. There are others no less absurd.
The plaintiffs’ counsel has corrected me in two inaccuracies, in referring to the Partidas, one of which can hardly be called one, for when I said the relations enumerated could not be witnesses at all, it certainly might be understood that they were excluded only in testifying for those relations, which is the text of the law. The other error pointed out, is one of the pen; but neither at all affects my argument. The 11th law, 3d Partidas, tit. 16, appears decisive. It first provides for the case of ascendants and descendants, and collaterals to the fourth degree; todos aquellos que suben o descendien, por la linea derecha de parientesco e los otros, de la linea de traviesso hasta el quarto grado. Now, if this included the affins, there would have been no need of any addition, but the law goes on to provide for them eo nomine. El yerno contra su suegro ni el suegro contra el ni el annado contra sa padrasto.
As I admit that the degrees of affinity mentioned in Bacon, and the other English authorities, are impediments to marriage in England, I have no observation to make on those authorities, but that I am totally at a loss to discern how they apply. If the English law had said generally, ascendants and descendants shall not intermarry, and these words had been construed to mean affins, then they might have had some application; at present I can see none.
The interest which it is supposed Fouque had in the event of the suit, by reason of the costs, is clearly an after thought; but is not like other second thoughts, the best; for it is not certain how the judgment of the court may operate as to costs, they are discretional; and even if given against Vignaud, should the plaintiffs prevail, it is by no means certain that the court would make Fouque pay them, if Vignaud had increased them, in an unnecessary, and unjust defence ; as it must be deemed if the plaintiffs prevailed. At any rate, if the objection had been made at the trial, it might have been removed by a release. No! says the plaintiffs’ counsel, and he quotes Jacob to prove it, your liability to costs is a mere possibility; and therefore, it cannot be released. Is it so? Then, there is no interest; for it never was before imagined that a mere possibility was interest, either direct or indirect. Is it not so ? Then the release would operate. Take your choice ; but do not say it is an interest, and therefore disqualifies. It is a mere possibility, and therefore cannot be released.
Seghers, for the plaintiffs.
Under the art. 63, p. 337, of our Code, there is a legal presumption of the existence of the community. If the defendant’s case makes an exception to the general rule, it was for him to prove it. As it is no longer contested that the slaves were acquired here after the marriage, it becomes immaterial where it was contracted. Were it otherwise, it would be no, difficulty to trace in the record, the proof that the defendant married here the daughter of the witness, and that from the very day of his marriage, up to the failure of the latter they resided together in the same house, and made but one family. This fact may be collected from the deposition of the defendant's own witnesses, in the suit of Fouque’s syndics against him, the record of which he introduced as evidence in this case.
The true defendant, in the present cause, is the community itself. It must be remembered that this is an action in rem, brought chiefly against the slaves, and accidentally against the defendant, as their third possessor. It is in evidence that he acquired them during his marriage, and therefore they belong to the community. The defendant coming into court to defend the suit, represents the community, which does, by his agency, what it would do by itself, were it a real being. In his capacity as head of the community, he is supposed to appear both for himself and for his wife; and the latter, though neither present in court, nor named in the defence, is supposed to appear with him for the share which she has in the community. The wife being then, in fact, a party to the cause, through the agency of her husband, her father is no less inadmissible as a witness than the father of the husband.
The principle, that the wife’s disposing of the effects of the community, depends on the will of the husband, is reciprocal, as expounded by Pothier, in the passages quoted in my former argument. For Pothier says, in his n. 500, that when the wife thus disposes, she is deemed to do it jointly with her husband, who is considered as approving the contract.
And in his n. 498, he says, that when the husband disposes alone of the effects of the community, he is supposed to contract both for himself and for his wife, who is supposed to contract with him for the share which she has in the community.
Leaving aside, for a while, the wife’s interest in the common stock, she is no less directly and actually interested in the increase or decrease of the common revenues, as I have shewn in my former argument, referring to our Code, p. 26, art. 20.
I persist in thinking, that the latter part of the art. 248. p. 312, of our Code, pronouncing the incapacities of ascendants and descendants, was thus far a restoration of the civil law. To this was my assertion confined ; for I have shewn, that by art. 249, the further incapacities pronounced on that subject by the civil law, were repealed. According to the defendant, the statute of 1805 had completely abrogated the civil law on witnesses. This necessarily left an inconsistency in our general system of jurisprudence, which it was the duty of the compilers of the Code to remove. That they did so, as far as was compatible with our present government, may easily be collected from the Code itself.
Before the statute of 1805 was enacted, the title 16, of the 3d Partida, de los testigos, was our rule; by that statute, which is nothing but the common law, no other exclusion is admitted than that of husband and wife. Therefore, the law 15, of the title quoted, which pronounces that exclusion, was alone preserved ; all the others were repealed. Now, our Code, by adding to this exclusion, that of ascendants and descendants, without distinction, did but restore the law 14, as it stood before. From what other source could the compilers have taken this disposition, than that whence is derived the whole system of our laws ? That, in fact, they did thereby restore the law 14 to its full extent ; that such was their meaning, clearly appears from the care they have taken to remove, by the art. 249, all doubts as to the limits within which, in restoring thus far the civil law, they intended to confine its operation.
According to the defendant, by the statute of 1805, we had parted altogether with the civil law on the subject of witnesses. If the Code had intended to persevere in that system; if it had not restored to its full extent, the part of the civil law comprised under the law 14; in a word, if it had been the meaning of the compilers solely to add to the former exclusion, the naked expression of ascendants and descendants, to be construed in the strictest manner, without any reference to our former laws on the subject; then, what was the use of the article 249 ? Certainly there could be no occasion for it. By that article it is provided, that the circumstance of being a relation in the collateral line, as far as the fourth degree inclusively, or engaged in the actual service or salary of one of the parties, does not affect the competency of the witness. Now, under the statute of 1805, none of those persons were excluded; and therefore, that provision in the Code was useless, unless it meant to restrain the operation of the civil law, or of so much thereof as was restored by the art. 248. It is the civil law which in its dispositions under the title 16, already quoted, comprises the very exclusions which are expressly removed by our art. 249.
If then the law 14 has been restored by our Code, the meaning of the compilers was to restore it to its full extent. That this law, under the denomination of ascendants and descendants, comprises the affins as well as consanguinei, I think I have satisfactorily shewn in my former arguments; it seems even to have been admitted by the defendant, though on a principle quite different from my own. If any restriction on that law had been intended ; if the affins were not to be included in its dispositions, this restriction on the civil law would have been added to those provided for by the art. 249.
If I have succeeded in proving that the law 14, tit. 16, Partida 3, is restored, the conclusions which I have drawn from comparing of the two passages of our Code, relative to marriages and to witnesses, remains unimpaired : for the incapacities pronounced by the civil law, on either of those heads, proceed from the same principle, that connections or affins are considered in the same light as relatives or consanguinei.
The defendant maintains, that this is not the reason why the affins were included in those incapacities, as well as the consanguinei; that they were never comprised but when mentioned eo nomine, and that the Spanish legislators thought affinity and consanguinity two relations so different, that when they wished to include the former, they used express words to that purpose. And he concludes with saying, that whether the exclusion of affins in the Spanish law, arose from statute, or was derived from the general principles of the civil law; whether we have it in the statute book, or in the elementary writers, it was still positive law, bearing upon that direct point, and expressly declaring that affins cannot be witnesses.
In corroboration of those strange assertions, he quotes the law 11 of the title 16, Partida 3, as decisive. It is, indeed, decisive, but in a way quite different from what he asserts.
This title 16, as already observed, treats of witnesses at large. The law 10, designates those who cannot be witnesses against others in criminal suits; and the law 11, those who cannot be compelled to be witnesses against each other in criminal suits. Quales son aquellos que no pueden ser apremiados, que vengan a testiguar unos contra otros en pleyto criminal. That this was not an exclusion but a privilege, appears from the law itself, and the note 1st of Gregorio Lopez. The reason given in the outset of the law for this privilege, is worthy of remark; it proceeds from the respect had to the duties which certain persons owe to each other. Debdos muy grandes han algunos omes entre si, de manera que non tuvieron por bien los sabios antiguos, que fuessen apremiados para testiguar unos contra otros, sobre pleyto que tanxesse a la persona de alguno dellos, ó a su fama, o a daño de la mayor partida de sus bienes. Then the law enumerates the persons to whom this privilege belongs, as quoted by the defendant, E son estos, todos aquellos que suben ó descienden por la liña derecha del parentesco, e los otros de la liña de traviesso fasta el quarto grado. Now, says the defendant, if this included the affins, there would have been no need of any addition, but the law goes on to provide for them eo nomine. Where the defendant has discovered, that parentesco (consanguinity) means also affinity, (cuñadez) and that I ever used it in that sense, I cannot tell. It is obvious, that the law, after mentioning consanguinity, eo nomine, and extending the privilege to the affins, must have done it also eo nomine. E esso mismo dezimos, que non debe ser apremiado en tales pleytos el yerno. que venga dar testimonio contra su suegro, ni el suegro contra el, nin el annado contra su padrasto, nin el padrasto contra el annado. This is also quoted by the defendant, but here he stops short; for what motives he best knows. Had he, however, gone a little further, he would have met with the reason of the law, with the very principle on which it grounds the extension of the privilege to the affins, as well as to the consanguinei. E esto es, porque los unos deben aver los otros como fijos, e los otros a ellos como pudres.
The laws 12 and 13, speak of the testimony of slaves, and the law 14 begins to treat of those who can or cannot be admitted as witnesses in civil cases. This law shews, in a striking manner, how groundless is the assertion, that the exclusion of affins in the Spanish law, arose from a positive provision bearing upon that direct point, and expressly declaring that affins cannot be witnesses. This is the only law of the whole title, on which the exclusion of affins as witnesses, in civil cases, is grounded; for the law 11, does but grant a privilege which may be renounced by the witness : that law too, bears only upon criminal suits. And here it will not be amiss to remark, that the Spanish legislator, after having once laid down in the 11th law, the principle upon which the affins are to be considered in the same light as the consanguinei, mentions them no more eo nomine, but includes them all under the general denomination of ascendants and descendants, as may be collected from the law itself, and from all its commentators. The law 14, runs as follows : Padre, nin abuelo, nin los otros que suben por la liña derecha, non pueden testiguar por sus fijos, nin por sus nietos, ni por los otros que descienden dellos por essa misma liña. Esso mismo dezimos que ninguno destos descendientes que non pueden testiguar, por aquellos de quien descienden.
On this law, we have the following commentary from Murillo, lib. 2, n. 153. Aliœ prœtereà sunt personæ, quæ pro certis personis testificari non possunt. Sic 1. Ascendentes masculi vel fæminæ in lineâ paternâ vel maternâ, pro descendentibus in utrâque lineâ, etiamsi filius sit emaneipatus, vel naturalis tantùm, vel spurius, vel incestuosus, vel adoptivus, testificari nequeunt; neque vitricus pro pririgno: nec é contrà descendentes pro ascendentibus : nam hi omnes ob naturalem affectionem suspecti habentur, lib. 14, tit. 16, Partida 3. 2. Ob candem affectionis suspicionem, a testimonio repelluntur conjuges et sponsi pro seipsis ad invicem ; item concubinarius pro concubinâ : consanguinei et affines usque ad quartum gradum exclusivè, pro consanguineis et affinibus in causis criminalibus vel civilibus arduis.
It remains to shew how the Curia Phillippica, with its reference to Barbosa, contradicts the defendant’s assertion, that it is only by express statutes that the affins are excluded, as well as the consanguinei. We agree with him, that the Curia Phillippica is a practical book, which gives the summary of the rules on the subject, from whatever source derived. The passage quoted from p. 86, n. 13. El pariente hasta el quarto grado, positively indicates the source whence it was taken: como se declara en unas leyes de Partida, quoting ley. 8, 10, et seq. usque ad 22, tit. 16, Partida 3. Now, as I have already stated, among those laws, the 14th alone relates to ascendants and descendants, in civil suits; and as the Curia refers to Barbosa on the subject, vot. 98, I will now quote his own words, of which I gave a translation in my first argument on the bill of exceptions. Alii sunt inter quartum gradum consanguinei el affines, et ideó non probant nec fidem merentur. Cùm isti testes commodum reportent, ut corum filii vel descendentes alipuando in illa (re) succedant, certum est eos non esse integros testes. Ratio est, quia si deponentes in casu ubi affection- em aliquam habent, ant eis imminent laus vel vituperium, non probant, livét negotium contra eos principaliter non agatur : multo minus debent probure illi, qui deponunt in casu, ex quo commodum, livèt in consequentiam, reportent; quia illa commodi affectio oculos caligare creditur.
As it is seen, the first part of this quotation is a commentary on the word pariente: the second part is illustrative of these words of the Curia: El interesado én la causa, and may be useful in settling the competency of Fouque as an interested witness.
I agree with the defendant, that the words ascendants and descendants must receive an uniform acception throughout the Code; that if they comprise affinity as well as consanguinity in the exclusion of witnesses, they must be so understood every where. I know, that the gentleman has pointed out the consequences as respecting successions; he now tells us there are others no less absurd, but he forgets designate them, and I am the more sorry for it, as it is in vain I endeavour to find them out, For I know but of three instances where those words are used in the Code ; evidence, marriage, successions. The consequences drawn from the latter. I have before answered in my first argument on the bill of exceptions. I shall only observe, that this objection is of an old date. The Roman Digest, lib. 22, tit. 5, l. 4, 5, exempts affins from testifying against each other, as it does consanguinei; and lib. 38, tit. 10, l. 4, sec. 7, it prohibits them from intermarrying, and lays down the principle on which both exclusions are founded. Hos itaque inter se, qùod affinitatis causâ parentum liberorumque loco habentur, matrimonio copulari nefas est. It seems, that the consequences drawn by the defendant as to successions, must even then have been objected. For in the Justinian Code, lib. 6, tit. 59, l. 7, we find, that under the emperor Diocletian, fifteen centuries ago, a positive provision was made to settle the objection. Adfinitatis jure nulla successio permittitur. Febrero in his Addicionada, part 1, cap. 1, n. 169, teaches us, that this law is preserved in Spain, and that, therefore, affinity gives there no right to succession. Ni da derecho à la sucession de los bienes de los afines. This law, standing unrepealed in this state, must silence the objection.
As to the incompetency of Fouque from direct interest, I have quoted in my first argument on the bill of exceptions, the law 19, tit. 16, Partida 3, which excludes him positively, as vendor, of the slaves. Of his being the vendor, the proof is on record. This law the defendant has passed unnoticed. But he has supposed that my observation on the liability of Fouque to the costs, was clearly an after thought. So was his own shift of the release. I do not know of any provision of the civil law which admits of such a release on the trial. It is a mere disposition of the common law, which cannot be allowed by our courts, except in trials by jury. Besides, how could that liability be released by the defendant, when it was still uncertain whether he would ever be condemned to costs, and when he had not paid them ? Be it as it may, it is now too late for him to plead this ground of defence. Had he intended to make use of it, it must have been done at the trial. His bill of exceptions, shews that I objected to the witness as incompetent, on account of interest; though it does not state on what grounds the court refused to admit him. I have proved, that he is interested as vendor, and that as such, he is, moreover, liable to the defendant for the costs, in case judgment goes against him. But, says the defendant, the costs are discretional ; and besides, it is by no means certain that Fouque be bound to pay them, if the defence be unjust and unnecessary.
I own I am at a loss to conceive on what principle of law or equity the court could exercise a discretion as to the costs of an expensive and tedious law-suit, in which minors are engaged, since several years. for the recovery of their patrimony wasted by their tutor. And even if the defendant were cast, and Fouque was exonerated for the costs of the defence as unjust and unnecessary, yet there would still remain then a part of the costs to which Fouque could have no objection, and for which he was always liable to the defendant, as the latter could not avoid them. The defendant was not the debtor of the plaintiffs, and therefore, their case did not come within the 31st sec. of the act of February 10, 1813. 2 Martin's Dig. 196. Their action was against the slaves, subject to their lien, of which he was the third possessor, and most, therefore, be governed by art. 43, p. 460, of our Code. According to it, after judgment Fouque, they have obtained an order of seizure on the slaves, which was notified to the defendant; and he, though not personally liable to the debt, has opposed the seizure, by virtue of the art. 44, of the Code, loco citato. Hence arose this action ; and therefore, if the costs were contested, those only could be so which accrued since his opposition. The filing of the petition cum annexis, the order of seizure, and the notification of it by the sheriff, to the defendant, occasioned costs, for which Fouque will always be liable to the defendant, who had, and could have no other notice of the plaintiffs’ claim, of which they were not bound to make him any other demand. But if they are cast, they will have no claim on Fouque, even for that part of the costs, which therefore constitutes at least his liability to the costs of the action, and makes him an incompetent witness. Phillip's Evidence, 46.

 Mathews, J. was absent.